IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JEANNETTE COLON MARIN, et al., | |
| Plaintiffs, | |
| v. | CIVIL NO. 20-1220 (CVR) |
| PRESBYTERIAN COMMUNITY HOSPITAL, INC., et al., | |
| Defendants. | |

## OPINION AND ORDER

### INTRODUCTION

The facts surrounding this case stem from the treatment rendered to decedent Tomás Colón ("Mr. Colón") at co-Defendant Presbyterian Community Hospital ("Presbyterian Community Hospital"), where Mr. Colón arrived at the emergency room in critical condition on December 6, 2016. Plaintiffs are Mr. Colón's daughter, Jeannette Colón Marín ("co-Plaintiff Dr. Colón") and his widow Teresa Marín Rodríguez ("co-Plaintiff Marín" collectively "Plaintiffs"). The remaining co-Defendants are Presbyterian Community Hospital, Dr. Manuel Figueroa ("co-Defendant Dr. Figueroa"), Dr. Josué Mercado ("co-Defendant Dr. Mercado") and Dr. Marcus Santiago ("Co-Defendant Dr. Santiago"). These three physicians provided treatment to Mr. Colón at different intervals after his arrival at the Presbyterian Community Hospital.

Mr. Colón died a little over a year later, on December 13, 2017 at Regency Hospital in Indiana. Plaintiffs filed this malpractice case averring that Mr. Colón's death was a result of the negligent treatment he received at the Presbyterian Community Hospital.

Before the Court now is co-Defendant Dr. Figueroa's "Motion for Summary Judgment" seeking dismissal of this case against him. (Docket Nos. 54 and 56). He contends he complied with the standard of care and that there is no causal relation between his limited intervention in Mr. Colón's treatment and his subsequent death over one (1) year later in Indiana. Before the Court are also Plaintiffs' opposition thereto (Docket No. 59) and co-Defendant Dr. Figueroa's Reply to Plaintiffs' opposition. (Docket No. 64).

For the reasons explained below, co-Defendant Dr. Figueroa's Motion for Summary Judgment is DENIED.

## STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (c). Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). A fact is deemed "material" if it potentially could affect the outcome of the suit. Id. Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the

party resisting summary judgment, could resolve the dispute in that party's favor." Id.  At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); see also Colón v. Infotech Aerospace Servs., Inc., 869 F.Supp.2d 220, 225-226 (D.P.R. 2012).  Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is -and what is not-genuinely controverted.'" Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006).

Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment.  A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must then "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c).   If they so wish, they may submit a separate statement of facts which they believe are in controversy.  Time and again, the First Circuit has highlighted that facts which are properly supported "shall be deemed admitted unless properly controverted." Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010) and Colón, 869 F.Supp.2d at 226.  Due to the importance of this function

to the summary judgment process, "litigants ignore [those rules] at their peril."

Hernández, 486 F.3d at 7.

## UNCONTESTED FACTS

1. At all relevant times herein, co-Defendant Dr. Figueroa was and still is a physician duly licensed for the practice of medicine in the Commonwealth of Puerto Rico as an internal medicine/nephrologist, with license number 16395 and had hospital privileges at co-Defendant Presbyterian Community Hospital.  D, Exhibit 1 at ¶ 8; D. Exhibit 2 at ¶ 8;  D. Exhibit 3.

2. At all relevant times herein, co-Defendant Dr. Santiago was and still is a physician duly licensed for the practice of medicine in the Commonwealth of Puerto Rico as a doctor of internal medicine/nephrologist. D. Exhibit 4 at ¶ 6

3. At all relevant times material to this action, co-Defendant Presbyterian Community Hospital owned and/or operated a hospital institution located in San Juan, Puerto Rico. D. Exhibit 5 at ¶5; D. Exhibit 6, ¶5.

4. Co-Plaintiff Dr. Colón is the daughter of Mr. Colón, the deceased.  D. Exhibit 5, ¶ 4.

5. Co-Plaintiff Marín is Mr. Colón's widow. D. Exhibit 5, ¶ 4.

6. Mr. Colón was a 77-year-old male when the facts that gave rise to this case arose. D. Exhibit 5, ¶ 12.

7. During the month of November 2016, Mr. Colón traveled with his wife to Mexico for vacation. During the [return] flight from Panamá to Puerto Rico on December 6, 2016, he started to feel ill after he ate, and his wife was scared that he might be having a heart attack.  The airplane captain assigned him a doctor. D. Exhibit 5, ¶

12; D. Exhibit 7, p. 25, l. 25; p. 26, l. 1-3.

8. Upon his arrival at the Luis Muñoz Marín Airport in Puerto Rico, Mr. Colón was transferred by ambulance to the Presbyterian Community Hospital. D. Exhibit 5, ¶ 12; D. Exhibit 7, p. 25, lines 15-22.

9. According to the entry of the Emergency Room medical records dated December 6, 2016 at 17:25 (5:25 pm) signed by the ER physician, Mr. Colón complained that he could not walk, and the paramedics stated that in the flight he "got dizzy and had diarrhea". He was later transferred to the Intensive Care Unit ("ICU") of the Presbyterian Community Hospital.  D. Exhibit 8.

10. Mr. Colón had several pre-existing medical conditions, including a history of chronic hypertension, obstructive sleep apnea, smoking history, and history of coronary artery disease as well as a diagnosis of chronic kidney disease and Parkinson. D. Exhibit 9, p. 66, l. 15-25; p. 67, l. 1-22.

11. According to the Internal Medicine Progress note dated December 7, 2016 at 20:33 (8:23 p.m.) signed by co-Defendant Dr. Santiago, Mr. Colón's daughter stated that he was "allergic to shellfish and while in Mexico ate at a seafood restaurant." D. Exhibit 10, pp. 4-5.

12. Co-Defendant Dr. Figueroa's intervention with Mr. Colón resulted from a consultation placed on December 7, 2016, in response to which he issued a report on December 7, 2016 at 12:00 (noon) signed at 12:08 pm, approximately 19 hours after Mr. Colón's arrival at the Presbyterian Community Hospital's Emergency Room.  D. Exhibit 11, pp. 1-5.

13. Co-Defendant Dr. Figueroa's assessment was that Mr. Colón had chronic kidney disease/injury, secondary to multifactorial etiology, sepsis shock, volume depletion.  Under "Plan", he recommended continuation of fluid administration, continued sepsis support with broad spectrum antibiotics, intravenous fluids, and if needed vasopressor, to keep mean arterial pressure over 65 mmHg.  D. Exhibit 11, pp. 1-3.

14. After co-Defendant Dr. Figueroa's evaluation, he contacted Mr. Colón's daughter by phone and explained in detail the impaired kidney condition her father was in, the corresponding treatment, the risk of progression of kidney failure, and the possibility of needing dialysis if the kidneys continued a tendency towards deterioration. D. Exhibit 3.

15. Mr. Colón remained at the Presbyterian Community Hospital for ten (10) months and following Hurricanes Irma and María in September 2017, was transferred to Porter Regional Hospital in Indiana where he remained until October 24, 2017. D. Exhibit 12.

16. Mr. Colón was transferred to the Regency Long Term Care Facility, also in Indiana, on October 24, 2017 for continued care and treatment, where he remained until his death on December 13, 2017.[1] D. Exhibit 12, p. 1; Exhibit 15.

17. Mr. Colón's death occurred one (1) year and one (1) week after his admission to the Presbyterian Community Hospital in Puerto Rico and two (2) months after his transfer to the Porter Regional Hospital. D. Exhibit 12; D. Exhibit 15.

---

[1] The Death Certificate indicates Mr. Colón died at Regency Hospital and the motion seems to use the names Regency Hospital and Regency Long Term Care Facility interchangeably. The Court understands them to be the same institution.

18. According to the Death Certificate issued by the Indiana State Department of Health, sepsis was indicated as the immediate cause of Mr. Colón's death.  Chronic respiratory failure and end stage renal failure were stated as conditions leading to the cause of the death. The approximate interval of the onset to death of these last two conditions was indicated as months.  D. Exhibit 15.

19. According to the Death Certificate, the onset of the sepsis that was the immediate cause of Mr. Colón's death was hours before his death. D. Exhibit 15.

20. According to co-Plaintiff Marín, she was told Mr. Colón had suffered a heart attack. He also had diabetes and had recently been diagnosed with Parkinson.  D. Exhibit 7, p. 19, l. 20-25; p. 20, lines 1-8; p. 40, l. 7-14.

21. Co-Plaintiff Dr. Colón moved to Indiana in the year 2015.  She is the Chair of the Obstetrics and Gynecology Department of the Northwest Medical Health Center, formerly Porter Regional Hospital, in Indiana, and has a private practice as well. D. Exhibit 13, p. 8, l. 4-13.

22. Co-Plaintiff Dr. Colón stated that, in the aftermath of Hurricane María, her father was transferred to Porter Hospital in Indiana in October 2017, in a severely ill, critical state, where he stayed at the most (2) two weeks in ICU and was quickly extubated. He started to feel much better, went back to his normal Puerto Rican color and as soon as he started feeling better, he was able to joke, such as making comments with the nurses. He was back to his typical funny, sarcastic self. He was then transferred to Regency Long Term Care Facility, which is close to Portage, in stable condition.  At Regency, they were mostly trying just to continue his care, like trying to give therapy and see if he could start eating and the like. Mr. Colón died

on December 13, 2017.  D. Exhibit 13, p. 25, l. 24-25; p. 26, l. 1-23; p. 29, lines 6-9.

## LEGAL ANALYSIS

Puerto Rico law governs this diversity case because Plaintiffs are residents of Indiana.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938).

The Puerto Rico Civil Code states that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31 § 1536 (2020).  Under this proviso, three elements comprise a *prima facie* case of medical malpractice.  A plaintiff must prove, and/or adduce evidence showing, "(1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances); (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm." Cortés-Irizarry v. Corporación Insular De Seguros, 111 F.3d 184, 189 (1st Cir. 1997); Rolón-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 (1st Cir. 1993); McGraw v. United States, 254 F.Supp.2d 242, 245 (D.P.R. 2003).

Under Puerto Rico law, there is the rebuttable presumption that the attending physician has observed reasonable degree of care while providing medical treatment. Sáez v. Municipio de Ponce, 84 D.P.R. 515, 543 (1962); Ramos Orengo v. La Capital, 88 PRR 306, 328 (1963); Del Valle Rivera v. U.S., 630 F.Supp. 750, 756 (D.P.R. 1986).  For this reason,  a plaintiff must establish, by preponderance of evidence, that the physician's negligent conduct was the factor that most probably caused the damage.  Sierra Pérez v. United States, 779 F.Supp. 637, 643 (D.P.R.1991); Pérez Cruz v. Hosp. La Concepción, 115 P.R. Dec. 721, 732 (1984).  Since it is such a specialized, technical area, the elements of

medical malpractice claims such as standard of care and causation require expert testimony. Alers v. Barceló, 2016 WL 4148237, at *3 (D.P.R. 2016).

Co-Defendant Dr. Figueroa seeks summary disposition of his claims, on two separate grounds. First, he proffers that he always complied with the standard of care. Second, he argues that there is no causal connection between his actions at the time he treated Mr. Colón, after he was admitted at the Presbyterian Community Hospital, and his ultimate demise, which occurred in Indiana over one (1) year later. Particularly, Dr. Figueroa notes that none of the three experts hired by Plaintiffs, Dr. Mark Fenig ("Dr. Fenig"), Dr. Lincoln Paul Miller ("Dr. Miller") and Dr. Jonathan Philip Bragg Elmer ("Dr. Elmer") reviewed the complete medical files, but rather were only asked to examine the treatment provided to Mr. Colón during his first days at the Presbyterian Community Hospital and nothing more. He further contends that the expert witnesses had no details regarding Mr. Colón's treatment in Indiana and did not recall or were unable to establish his cause or even date of death during their depositions, precisely because they failed to examine the records at the Indiana institutions.

As established by the uncontested facts, Mr. Colón arrived at the emergency room on December 6, 2016 after returning from a trip to Mexico, and complained that he could not walk, and had dizziness and diarrhea. After he was triaged, he was transferred to the ICU of the Presbyterian Community Hospital.

The claims against co-Defendant Dr. Figueroa arise from a consultation placed the day after in response to which he issued a report at 12:00 noon that same day, approximately 19 hours after Mr. Colón's arrival at the Emergency Room. Plaintiffs' three medical expert witnesses all agree with this, and the evidence so demonstrates.

Mr. Colón remained at the Presbyterian Community Hospital for over ten (10) months. After hurricane María hit Puerto Rico on September 20, 2017, he was transferred to Indiana, where his daughter co-Plaintiff Colón worked.  According to co-Plaintiff Dr. Colón, following her father's arrival at the Porter Regional Hospital, he remained at the ICU for two (2) weeks and was extubated, he started to feel better, and regained his natural color.  He was then transferred to Regency Long-Term Care where his condition was stable and apparently improved, and where he remained until his death on December 13, 2017.  The Death Certificate issued by the Indiana State Department of Health listed sepsis as the immediate cause of death, and chronic respiratory failure and end stage renal failure as conditions leading to his death.

### A.  Summary of the expert witnesses' testimonies.[2]

Plaintiffs retained three expert witnesses, to wit, Dr. Elmer, a specialist in critical and neurocritical care; Dr. Fenig, an emergency medicine physician; and Dr. Miller, an infectious disease specialist. Nephrologist Dr. Mark Edward Williams ("Dr. Williams") is co-Defendant Dr. Figueroa's expert witness.

1.  Dr. Elmer.

Dr. Elmer is an expert in critical and neurocritical care.  The opinion rendered by him in this case are from the emergency medicine and critical care standpoint.

Dr. Elmer was not provided with the records from Porter Regional Hospital in Indiana and his opinion was based exclusively on the review of the records of the first days Mr. Colón arrived at the ER of the Presbyterian Community Hospital. He did not

---

[2] The Court derived this summary from the facts provided by co-Defendant Dr. Figueroa in his motion, as well as the expert reports submitted by Plaintiffs.  (Docket Nos. 55 and 67).

review any of the other medical records, although he was told they were approximately 19,000 pages.

Dr. Elmer's concern was the delay in treating Mr. Colón, plus the lack of inadequate fluid resuscitation.  His main points were that Mr. Colón did not receive adequate fluids and the delay in treatment in receiving the liquids, and testified that in his opinion, the fluids and the antibiotics had to be administered during the first hours that Mr. Colón was in the ER.  Dr. Elmer opined that the order for fluid administration should have been given by the emergency physician and the admitting internist who received Mr. Colón in the ICU.

From the medical records examined, Dr. Elmer obtained information pertaining to Mr. Colón's medical conditions, including a history of chronic hypertension, obstructive sleep apnea, smoking history, and history of coronary artery disease as well as a diagnosis of chronic kidney disease and Parkinson.  Dr. Elmer testified that Mr. Colón had multi-system organ failure when he arrived at the Presbyterian Community Hospital. He had respiratory insufficiency, cardiac strain, as demonstrated by his positive troponin, encephalopathy or brain dysfunction as evidenced by his confusion and he had acute chronic kidney injury. Mr. Colón also arrived at the Presbyterian Community Hospital with severe sepsis, and at some point, during the night from the 6th to the 7th of December 2016, developed septic shock.

Dr. Elmer's report had three findings of alleged deviation from the applicable standards, to wit, inadequate fluid resuscitation, failure to give appropriate antibiotics and maintenance of arterial blood pressure. He concluded that those responsible for providing this treatment were the emergency physician and after admission, the internist

who was the admitting doctor.

    2. Dr. Fenig.

Dr. Fenig is board certified in emergency medicine and was engaged to review certain medical records and determine whether there were deviations from the standard of care. Dr. Fenig's review was limited and focused on the events that occurred between December 6 and 7, 2016, beginning when Mr. Colón was triaged and entered the emergency department, through the morning of December 8, 2016, at 5:30 a.m. Dr. Fenig indicated that co-Defendant Dr. Figueroa's intervention with Mr. Colón was within the time frame he considered relevant.

Dr. Fenig stated that Mr. Colón may have suffered some irreversible damage fourteen (14) hours after arriving at the Presbyterian Community Hospital but admitted that it was impossible to give an opinion as to the exact time the damage occurred, how much of the damage was irreversible and which organs were affected. Dr. Fenig was the only expert witness who opined when Mr. Colón may have suffered irreversible damage.

Like Dr. Elmer, Dr. Fenig was not provided, nor did he examine, any records pertaining to Mr. Colón's transfer to Porter and Regency Hospitals in Indiana and his subsequent treatment. When asked about the length of Mr. Colón's stay at the Presbyterian Community Hospital, Dr. Fenig indicated that he thought it was at least weeks even though it was over ten (10) months. Dr. Fenig also acknowledged he did not recall the reason for Mr. Colón's transfer to Indiana, he did not know how long he remained at the Indiana facilities, the type of additional treatment, if any, he received while or after leaving the Presbyterian Community Hospital, whether he was referred to more than one institution after leaving Puerto Rico, the date of Mr. Colón's demise or his

official cause of death.

Dr. Fenig further admitted that the records he reviewed were limited to a consultation on December 7, 2016 roughly nineteen (19) hours after Mr. Colón's arrival at the emergency room of the Presbyterian Community Hospital and that he was not familiar with Mr. Colón's complete 19,000-page medical record.  As a result, he could not give an opinion as to whether the treatment received by Mr. Colón after he was transferred contributed to his death.

3.  Dr. Miller.

Dr. Miller is active as an infectious disease specialist.  Like his counterparts, Dr. Miller did not review the medical records at either of the Indiana facilities.  He also did not review the Complaint, as he did not consider it necessary for what he was tasked with doing, which was to review Mr. Colón's initial admission at the Presbyterian Community Hospital and determine whether the treatment Mr. Colón received contributed to his death.

Dr. Miller focused on the deviation of the standard regarding the fluid administration, not on the medications ordered, since in his opinion the lack of fluids was the most important issue in terms of the resuscitation for the sepsis. According to Dr. Miller's deposition testimony, co-Defendant Dr. Figueroa deviated from the standard of care by not ordering the standard amounts of fluids required, but the prior physician who intervened on December 6, 2016 should have started with the fluid administration.

Dr. Miller admitted that, when Mr. Colón arrived at the Presbyterian Community Hospital, he had serious pre-existing medical conditions and including chronic respiratory failure, which was one of the causes of his death, and which he had suffered

for some time prior to his death.  Dr. Miller also admitted that, according to the Death Certificate, sepsis started hours before Mr. Colón's death.  Dr. Miller did not know how long Mr. Colón was at the Presbyterian Community Hospital, the reason for the transfer to Indiana, how long was his stay at the Porter Regional Hospital or at Regency Hospital following his transfer from Puerto Rico before his death.   Dr. Miller was also not aware that Mr. Colón showed improvement in his condition after his transfer to the Porter Regional Hospital in Indiana.

4. Dr. Williams.

Dr. Williams is a nephrologist retained by co-Defendant Dr. Figueroa.  According to Dr. Williams, co-Defendant Dr. Figueroa met the standard of care in the application of a more conservative fluid administration as it applied to Mr. Colón with multiple comorbidities[3] and risk of fluid overload. Dr. Williams opined that, while the moderate fluid resuscitation/pressor administration approach supported by co-Defendant Dr. Figueroa did not reverse the worsening of kidney function tests initially, the approach was sufficient to result in improvement of Mr. Colón's kidney function over the next eleven (11) days.

Dr. Williams also declared that the initial fluid resuscitative attempts to stabilize Mr. Colón met the standard of care and served to allow an initial improvement in kidney function while avoiding overt fluid overload. Despite this initial response to therapy, Mr. Colón's subsequent overall clinical course was protracted and irreversible. Dr. Williams concluded the death of Mr. Colón was not causally related to the treatment provided by

---

[3] Dr. Williams stated that Mr. Colón's terminal comorbidities included a vegetative state, morbid obesity, respiratory failure, and cardiovascular instability.

co-Defendant Dr. Figueroa nor did said treatment contribute to his hospital stay and eventual death.

### B. Applicable law.

Federal Rule of Evidence 702 states that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

A review of the case law after Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 595, 113 S.Ct. 2786 (1993) shows that the rejection of expert testimony is the exception, rather than the rule.  The Daubert case did not work a "sea change over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 595.

Furthermore, it has been established that "Daubert does not require that a party proffering expert testimony convince the court that the expert's assessment of the situation is correct, but only has to rest upon good grounds.  United States v. Perocier,

269 F.R.D. 103, 107 (D.P.R. 2009) (*citing* Ruiz-Troche v. Pepsi Cola of Puerto Rico, 161 F.3d 77, 85 (1st Cir. 1998)).

For this reason, the district court's analysis must be flexible, not rigid, and must ensure that expert testimony is relevant.  Daubert, 509 U.S. at 592. Besides establishing relevancy, the Court must also ensure that the expert opinion is sufficient and reliable. Carrelo v. Advanced Neuromodulation Sys., Inc., 777 F. Supp. 2d 315, 318 (D.P.R. 2011).

Courts have held that, under certain circumstances, expert opinions based on incomplete review of the records may be admissible under Daubert. "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weight its inadequacies.'" Ruiz-Troche, 161 F.9d at 85. Considering this standard, an expert basing his findings on incomplete records, "go[es] to the weight of the testimony and not to the Daubert exclusion of the same.'" Wetherell v. Hospital Interamericano de Medicina Avanzada, Civil No. 06-2079, 2009 WL 564200, *3 (D.P.R. March 5, 2009).

Similarly, the First Circuit has upheld the admissibility of expert testimony where although "the factual bases for some of [the] expert opinions as to cause of injury were incomplete, he did not base his opinions on pure conjecture." Coleman v. De Minico, 730 F.2d 42, 45 (1st Cir. 1984). "When the factual underpinning of an expert opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." Newell P.R., Ltd. v. Rubbermaid Inc., 20 F.3d 15, 21 (1st Cir. 1994).

There is no doubt that in this case Plaintiffs' three expert witnesses qualify as such

because of their scientific and specialized knowledge. Consequently, their testimonies will help the jury, as trier of facts, to better understand the relevant issues in this case.

Co-Defendant Dr. Figueroa's main problem seems to be with element number two, namely, that the testimony be based on sufficient facts or data.[4]  He argues that all three expert witnesses limited their review to records pertaining to the first few days of Mr. Colón's arrival at the Presbyterian Community Hospital, and they failed to examine the complete medical record,[5] including the records leading up to his death.  Thus, the expert witnesses lack important information related to the treatment Mr. Colón received, particularly after the first few days and afterwards, when he was treated in Indiana, and ultimately cannot establish causation.  Plaintiffs argue instead that this is a matter of weight and credibility for the jury to resolve.

Although the expert witnesses' review of incomplete medical records to support their causation opinions is problematic and subject to substantial challenge, the Court agrees with Plaintiffs that this a matter best left to the jury.  See Carrelo 777 F. Supp. 2d at 318-19 (a challenge to the factual underpinnings of an expert opinion is a matter that affects the weight and credibility of the testimony and is a jury question) (*citing* United States v. Vargas, 471 F.3d 255, 264 (1st Cir. 2006) and Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc., 851 F.2d 540, 545 (1st Cir. 1988)).

While Plaintiffs may have been better served in the end by having their expert witnesses review the complete medical records to learn about Mr. Colón's subsequent treatment after his arrival at the Presbyterian Hospital and ultimate death, the Court

---

[4] Co-Defendant Dr. Figueroa did not make an argument pertaining to the other Rule 702 factors, lack of reliable principles and methodology, or regarding reliability and its application to the facts of the case.
[5] Mr. Colón's complete medical file consists of approximately 19,000 pages.

cannot categorically say at this stage, when all inferences must be made in favor of the non-moving party, that the expert testimonies are based on insufficient data and that Plaintiffs cannot establish causality with these facts.  All three expert witnesses concluded that the initial treatment given at the Presbyterian Community Hospital deviated from the standard of care and contributed to Mr. Colón's eventual death.  Whether or not Plaintiffs can ultimately prove that conclusion at trial without their expert witnesses having examined and opined upon the remainder of the record is not for this Court to determine at this stage, but is a matter entrusted to the jury as part of its fact-assessment duty.  Co-Defendant Figueroa will have a full opportunity to cross-examine Plaintiffs' expert witnesses at trial, and it may well be that the jury finds their opinions on causation entitled to no weight whatsoever based on the factors described above.

Co-Defendant Dr. Figueroa also presents his own expert witness report to establish that he did not deviate from the standard of care.  The conclusion rendered by Dr. Williams obviously directly contradicts those rendered by Plaintiffs' three expert witnesses.  Once again, it is not the province of the Court, rather of the jury, to evaluate conflicting statements and give them their appropriate probative value.  This is precisely the kind of issue that falls squarely within the jury's province.  Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc., 999 F.3d 37, 53 (1st Cir. 2021) (noting that, in deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge") (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)).  It will be up to the jury to evaluate all the conflicting expert testimony in this case, give it the weight the jurors see fit, and resolve this issue one way or the other.

Regarding causation, co-Defendant Dr. Figueroa argues that Plaintiffs' expert witnesses all concluded that the obligation to provide the adequate fluid and antibiotics rested with the emergency room physician and the admitting doctor, and because he treated Mr. Colón nineteen (19) hours after his admission, there is no causal nexus between the injury and his actions.  The Court cannot agree on summary judgment because there are multiple factual issues surrounding the issue of causation that are only proper for a jury to decide.

Dr. Elmer stated that Mr. Colón had multiorgan failure when he arrived at the Presbyterian Community Hospital as well as sepsis, respiratory insufficiency, cardiac strain, and at some point, during the night from the 6th to the 7th of December 2016, developed septic shock.  He opined that the order for the additional fluids should have been given by the emergency physician and the admitting internist who received the patient in the ICU.  This clashes with the opinion of his counterpart, Dr. Miller, who specifically opined that co-Defendant Dr. Figueroa deviated from the standard of care by not ordering more fluids when he attended to him.  As a matter of fact, all three of Plaintiffs' expert witnesses coincided in that the lack of fluids was detrimental and ultimately fatal to Mr. Colón.  This conclusion is naturally at odds with the opinion of co-Defendant Figueroa's expert, Dr. Williams, who stated that the standard of care was met regarding the fluid administration.  Determining who had the responsibility for the fluid order and how much fluids were necessary are essential issues in this case.  Given the existing differences of opinion as to this matter, the Court would be remiss in granting summary judgment.

Additionally, Dr. Fenig stated that Mr. Colón may have suffered some irreversible

damage fourteen (14) hours after arriving at the Presbyterian Community Hospital, that is, before co-Defendant Dr. Figueroa's consultation and intervention, although he admitted that it was impossible to give an opinion as to the exact time the damage occurred, how much of the damage was irreversible and which organs were affected. Determining when the damage occurred and the extent of said damage are also important factors in this case because Mr. Colón lived for over a year after his admission to the Presbyterian Community Hospital.  The fact that Dr. Fenig cannot pinpoint these crucial issues further demonstrates that summary judgment is not warranted because these are facts for a jury to consider.

The Court further notes that co-Plaintiff Dr. Colón mentioned in her deposition that after her father was transferred to Indiana, he was extubated, stable and improved considerably.  This contrasts with the opinion rendered by Plaintiffs' own expert witnesses that the damage caused by the treatment provided at the Presbyterian Community Hospital with the first hours of admission was irreversible.  As there are conflicting versions regarding the condition of Mr. Colón's overall health, the Court finds this is a matter best left for the jury to assess in its credibility determinations.[6]

Co-Defendant Dr. Figueroa attempts to make an issue that Dr. Miller was the only one to specifically state that he deviated from the standard of care by not administering more fluids and argues that this opinion "can carry no weight" because it contradicts the testimonies of Dr. Elmer and Dr. Fenig.[7]  Co-Defendant Figueroa forgets that these

---

[6] As the defense candidly points out, none of the expert witnesses retained by Plaintiffs could pinpoint the exact time the damage occurred.

[7] As previously stated, Dr. Fenig and Dr. Elmer concluded that it was the responsibility of the ER physician and admitting doctor to do so.  Docket No. 56, p. 15, ¶ 40.

contradictions in testimony are precisely the kind of issues that cannot be resolved at the summary judgment stage and which the jury is tasked with resolving.  The same reasoning applies to the argument that Plaintiffs' expert witnesses ignored Mr. Colón's preexisting conditions and their possible contributing effect on his overall health and eventual demise.  These issues all pertain to the expert witnesses' credibility and weight of their testimony, which is for the jury, not the Court, to consider and decide.  Co-Defendant Dr. Figueroa will have ample opportunity to cross examine these experts and explore these issues in as much detail as he desires during the trial.

Finally, the Court must mention that all of Plaintiffs' expert witnesses concluded that Defendants' actions failed to meet the standard of care and contributed to Mr. Colón's prolonged illness, hospitalization, and eventual death.  While co-Defendant Dr. Figueroa argues that the causal link tying his actions to Mr. Colón's death cannot be made due to the amount of time that passed between the initial admission at the Presbyterian Community Hospital and the death, Plaintiffs' three expert witnesses explicitly make that link, and so conclude in their reports.  They further indicate, and the record clearly establishes, that Mr. Colón had several contributing health conditions for some time before he passed away.  For example, Dr. Miller stated in his deposition that Mr. Colón suffered from renal disease and chronic respiratory failure, and this meant the onset of these conditions was months before his demise.  The Death Certificate also clearly listed these two conditions as causes of death.  Given the unique facts of this case, where a substantial amount of time passed between the actions complained of and Mr. Colón's ultimate demise, a reasonable trier of fact could conclude the opposite of co-Defendant Dr. Figueroa's argument - that the treatment rendered at the Presbyterian Community

Hospital contributed to or exacerbated these long-term conditions and ultimately caused Mr. Colón's death.   This is yet another reason why summary judgment is not appropriate at this juncture and why this is a matter best suited for a jury to determine.

## CONCLUSION

As the First Circuit has indicated many times "summary judgment is not a substitute for the trial of disputed factual issues." Rodríguez v. Municipality of San Juan, 659 F.3d 168, 178-179 (1st Cir. 2011).  Such is the case here.  The Court finds issues of material fact prevent summary disposition of this case.   Accordingly, co-Defendant Dr. Figueroa's Motion for Summary Judgment (Docket No. 54) is DENIED.[8]

The Pre-trial/Settlement Conference will be set via separate Order.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 8th day of October 2021.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE

---

[8] The Court's ruling is not final, and the admissibility of the expert witnesses may be revisited, either in a motion in limine prior to trial or in a motion for judgment as a matter of law at trial.